UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Independent Chemical Corporation,    :
    :
          Petitioner,    :          **MEMORANDUM AND ORDER**
    :
          -against-    :          05-CV-1987 (DLI)(JMA)
    :
Local Union 807, International Brotherhood :
of Teamsters,    :
    :
          Respondent.    :
-------------------------------------------------------x


**DORA L. IRIZARRY, U.S. District Judge:**

Independent Chemical Corporation ("ICC"), a company that manufactures and mixes

chemicals for industrial cleaners and food additives, moves to vacate an arbitration award, issued

on February 2, 2005, rendered in favor of Local Union 807 ("Local 807"). Local 807 cross-moves

to have the award confirmed. The arbitration award calls for the reinstatement, with back pay, of

an employee who was prohibited from returning to work after ICC discovered that he had been

indicted for several felonies. The award was issued pursuant to the grievance and arbitration

provisions of the collective bargaining agreement ("CBA") between ICC and Local 807.[1] ICC

argues that the arbitration award should be vacated because (1) the arbitration panel exceeded its

powers, and (2) the award violates public policy. The court held oral argument on this matter on

February 21, 2006, at which both sides presented thorough and well-prepared arguments. As

explained below, the court denies ICC's motion to vacate the arbitration award and grants Local

---

[1] The parties attached as exhibits excerpts from the CBA, the National Master Freight Agreement, covering over-the-road and local cartage employees of private, common, contract, and local cartage carriers, in effect from April 1, 2003 through March 31, 2008.

1

807's cross-motion to confirm it.

## I.    Facts

Anthony Bennett ("Bennett"), a member of Local 807, was hired by ICC on June 28, 2000 to work at the ICC warehouse, which has no security personnel. Bennett worked primarily the second shift, from around noon to 9:00 p.m., with limited supervision after 5:00 p.m. Bennett handled materials such as ammonium nitrate, peroxide, alcohols and solvents, oxidizers, caustics, corrosives, sodium hydrochloride, sulfuric acid, hydrochloride, hydrochloric acid, and ammonias (the "Materials").

Following oral argument, the court asked the parties to submit a stipulation describing Bennett's duties in more detail.

> In his normal workday, Bennett routinely handled the Materials, relabeling, transferring materials from one container to another, including from 55 gallon to 5 gallon drums, took samples from various drums for customers and suppliers, opened and closed these containers, drove a forklift, lifting both by hand and by forklift and hi-lo machines containers and pallets of boxes and drums of these Materials, carried boxes, bottles and drums of these Materials within and between the Company's three warehouse buildings, onto and off of customer and supplier trucks, received these Materials from outside delivery persons in bags, boxes, drums and on pallets, and gave these Materials to outside drivers, both by hand and on pallets by forklift.

(3/31/06 Stipulation ¶ 5.) Bennett "routinely worked in the back of the warehouse, repacking pallets, transferring, mixing and labeling the Materials." (*Id*. ¶ 6.) Bennett did not have the Department of Transportation-mandated certifications required for him to drive delivery trucks to and from customers on public roads. However, from time to time, Bennett "worked as a helper on delivery trucks making deliveries and picking up product over the road, arranging and moving these Materials, organizing and strapping them down inside the backs of trucks and moving them between

truck and customer locations, and he drove tractor trailers containing such Materials within the ICC warehouse compound." (*Id*. ¶ 8.) Bennett had access to and possession of keys for the vehicles he drove within the warehouse compound and on which he helped make deliveries.

ICC submitted several letters documenting warnings given to Bennett in late 2003 and February, March, and July 2004 for lateness, disappearances during shifts, improperly loading chemicals, and violating company phone use policies. Warehouse manager Joseph Siachitano reports that, when he suspended Bennett for misloading chemicals in December 2003, Bennett "got in [his] face and screamed at [him] saying 'you can't do this' and 'who are you to threaten me,'" screaming at Siachitano for about fifteen minutes in front of the entire night shift. (Siachitano Aff. ¶ 3.) Siachitano again suspended Bennett around mid to late February 2004, and, upon giving Bennett the suspension letter, Bennett threw the letter at Siachitano. When Siachitano told Bennett to pick up the letter, Bennett said "you can go fuck yourself." (*Id*. ¶¶ 4–5.) Siachitano reports being "fearful" of Bennett, that he has seen Bennett punch a steel forklift at work, that other employees have expressed a fear of Bennett,[2] and that other employees told him that Bennett once brought a nine millimeter gun to work. (*Id*. ¶ 7.) Siachitano also learned from the Union Delegate, Kevin Broudy, that Bennett had beaten a woman during work, grabbing her by the throat and kicking and punching her in the face. (*Id*. ¶ 9.) The woman, not an employee, had twice smashed into Bennett's car in front of the warehouse.

On or about July 22, 2004, Bennett was arrested for shooting his common law wife in front of their daughter. According to Detective James R. Woods, Bennett admitted to him that he shot the

---

[2] Affidavits expressing fears were submitted by the ICC Office Manager and a customer service representative.

victim and discarded the firearm in the building's trash compactor. (Pet'r Ex. A.5.) Bennett was

indicted for attempted murder in the second degree (a class B felony), assault in the first degree (a

class B felony), criminal possession of a weapon in the second degree (a class C felony), reckless

endangerment in the first degree (a class D felony), and endangering the welfare of a child (a class

A misdemeanor).[3] The incident was reported in the press, including by the *New York Daily News*,

the *New York Sun*, and the *New York Post*. ICC stated at oral argument that Bennett had been

released on bail and was awaiting trial. Since then, the court has learned that, on April 12, 2006,

Bennett was acquitted of all felony charges and convicted on two counts: criminal possession of a

weapon in the fourth degree and endangering the welfare of a child. Bennett is presently scheduled

for sentencing on May 23, 2006.

Between July 22 and August 11, 2004, ICC claims that Bennett was absent from work

voluntarily on "disability leave." On August 11, 2004, attorneys for ICC sent a letter to Bennett

stating that he would "not be allowed to return to work at the Corporation pending determination of

felony charges" brought against him. (Pet'r Ex. A.7.) The letter explained:

> Independent Chemical Corporation is required both by law and by its union contract
> with Local 807 Teamsters union to provide and insure a safe workplace for its
> employees and to take all necessary steps to avoid dangerous conditions of work,
> danger to person or property, and harm to customers and the general public as well
> as to employees. The nature of your alleged violent crimes may reasonably create
> feelings of danger and fear among your fellow employees, supervisors, office
> workers and others, so as to interfere with the proper operation of the Corporation's
> business. Given the nature of the Corporation's product and your work in the
> warehouse, involving the storage, mixing and movement of dangerous chemicals,
> particularly in this time of heightened terrorism alert, the Corporation can not allow
> you to return to work unless and until you are cleared of the charges.

---

[3] The relevant sections in the N.Y. Penal Law are, respectively: §§ 110 / 125.25, 120.10,
265.03, 120.25, and 260.10. Felony classes are also specified in N.Y. Penal Law § 70.02.

(*Id*.)  ICC Vice-President Jonathan Spielman reports that, after this incident, warehouse manager Joseph Siachitano reported that "several of the warehouse employees were afraid for their safety if Bennett returned to work."  (Spielman Aff. ¶ 7.)

On August 13, 2005, Local 807 filed a grievance on behalf of Bennett, alleging violation of "Article 44 but not limited too [sic]" of the CBA because of "'unjust suspension[.]'  Griev[a]nt not allowed back to work after disability leave."  (Pet'r Ex. C.)  As remedy, Local 807 requested that Bennett "be made whole for all lost wages & benefits [and] health welfare & pension contributions [and] . . . be reinstated at [the] worksite as soon as possible."  (*Id*.)

The grievance was presented to an arbitration panel on February 2, 2005, pursuant to Article 45 of the CBA, which states that decisions by such panel "shall be final and binding upon the parties" absent deadlock.  After a two-hour hearing, the arbitration panel issued a one-page decision, finding "no violation [of] Article 44 [but] the claim of the Union is upheld."  (Pet'r Ex. F.)  The decision contained no other explanation of the panel's reasoning or conclusions.

## II.      Standards of Law

The court's review of an arbitration decision is very limited, and the burden of proof is on the party moving to vacate the award.  *See, e.g.*, *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997).  "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."  *United Steel Workers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960).

**1.      Authority of Arbitrator Exception**

Under the Federal Arbitration Act, the court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  The court must confirm the award "so long as it draws its essence from the collective bargaining agreement"  and is not the arbitrator's "own brand of industrial justice."  *Enter. Wheel & Car*, 363 U.S. at 597.  Courts may not review the merits of the arbitrator's decision and must defer to the arbitrator's interpretation of the collective bargaining agreement.  *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).  Except decisions procured through fraud or dishonesty, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  *Id.*

The arbitrator is not required to write a decision stating the reasons for the award.  *See, e.g.*, *Enter. Wheel & Car*, 363 U.S. at 598; *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998).[4]  Furthermore, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."  *Enter. Wheel & Car*, 363 U.S. at 598.  Where, as here, the arbitrator has provided no explanation for the award, the Second Circuit has held in cases discussing another exception, manifest disregard of the law, that the court must make inferences from the record.  *See, e.g.*, *Wallace v. Buttar*, 378 F.3d 182, 192–93 (2d Cir. 2004); *Willemijn*, 103 F.3d at 12–13.  "[I]f

---

[4] However, the Second Circuit has stated that "when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account."  *Halligan*,148 F.3d at 204.

a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991) (quoting *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1216 (2d Cir. 1972)). It seems appropriate to import this language from cases analyzing arbitration awards under the manifest disregard of the law exception, because, in discussing this exception, the courts emphasize giving deference to the arbitrator as long as the award draws from the collective bargaining agreement. *See, e.g.*, *Wedbush Morgan Sec., Inc. v. Robert W. Baird & Co.*, 320 F. Supp. 2d 123, 127 n.3 (S.D.N.Y. 2004).

In the present case, not only did the arbitration panel not provide any reasons for its decision, but it also found that the only provision of the CBA cited, Article 44, was not violated. The court is thus left to speculate and infer from the facts of the case what possible CBA provision the arbitration panel may have found violated. While ICC maintains that the arbitration panel did not consider any other provision at the hearing other than Article 44, Local 807 relies heavily on the language in the grievance, and repeated in the arbitration panel's decision, that the provisions of the CBA at issue were "Article 44 but not limited too [sic]." Local 807 argues that the panel considered two separate issues: (1) the seniority rules under Article 44, and (2) "unjust suspension." Regarding "unjust suspension," Local 807 states that "[t]he Joint Panel has jurisdiction to hear grievances concerning discharges and suspensions" and argues that the panel's decision "draws its essence from the" CBA because "[t]he grievance clearly concerned a suspension, and the contract granted jurisdiction to the Joint Panel to hear suspension grievances." (Local 807 Reply Mem. at 2–3.) This argument relates to Article 47 of the CBA. Though neither side gave much attention to this provision in the motion papers, the court questioned the parties about Article 47 at oral argument. Upon reading it, Article 47 is a provision that the arbitration panel may have found violated. Article

47 provides:

> In respect to discharge or suspension, the Employer shall give at least one warning notice of the specific complaint against such employee, in writing and a copy of same to the Union and the shop steward, except that no warning notice need be given to any employee before he is charged or suspended if he is discharged or suspended for any of the causes listed in Section 2 below or suspended for theft of time.

(Cary Aff. Ex. B at 171.)  Warning notices must be "issued by the Employer within seven (7) days, excluding Saturdays, Sundays, and holidays, from the date the Employer knew of or reasonably should have become aware of the specific grounds and circumstances upon which it is based." (*Id*.) There is no indication that ICC sent any warning notices to Bennett, the Union, and the shop steward. ICC suggested at oral argument that, by not allowing Bennett to return to work, ICC had not suspended him, but the court disagrees and interprets ICC's action as actual or constructive suspension.

> The causes "for immediate discharge" listed in Section 2 of Article 47 of the CBA are:

> proven theft of money, goods, or merchandise during working hours, proven drunkenness, or proof of being under the influence of liquor or drugs during working hours, calling an unauthorized strike or walkout, assault on Employer or his representative during working hours, failure to report an accident which the employee would normally be aware of, proven recklessness resulting in a serious accident while on duty, or the carrying of unauthorized passengers in the vehicle while on duty, engaging in unauthorized transportation of merchandise or goods for personal gain during working hours, possession of firearms on company property or equipment.

(*Id*. at 172.)  As Local 807 pointed out at oral argument, ICC could have discharged Bennett immediately, without notice, for bringing the nine millimeter gun to work, had this been proven. But ICC did not pursue this course of action. ICC represented at oral argument that this violation was not discovered until after Bennett had been indicted on felony charges. Regardless of when the gun incident was discovered, the nine millimeter gun was not mentioned in the suspension letter ICC sent

to Bennett.  Nor, as Local 807 indicated, did ICC ever reprimand Bennett for any of his alleged

violent proclivities at the workplace.  On the record, considering the reasons for Bennett's

suspension as clearly set forth by ICC in the August 11, 2004 letter and ICC's failure to submit any

warning notices before his suspension, the arbitration panel may have arguably found Article 47

violated.  Because of the deference that must be accorded to the arbitration panel, the award cannot

be vacated on the basis that the panel exceeded its authority.


**2.**      **Public Policy Exception**

ICC also moves to vacate the arbitration award on the basis that it violates public policy.

This exception derives from the common law rule that courts may hold unenforceable contracts that

violate public policy.  *See, e.g.*, *Misco*, 484 U.S. at 42 (citing *W.R. Grace & Co. v. Local Union 759,*

*Int'l Union of United Rubber Workers*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983);

*Hurd v. Hodge*, 334 U.S. 24, 34–35, 68 S. Ct. 847, 92 L. Ed. 1187 (1948)).  The public policy

articulated "must be explicit, well defined, and dominant.  It must be ascertained by reference to the

laws and legal precedents and not from general considerations of supposed public interests."  *E.*

*Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed.

2d 354 (2000) (quoting *W.R. Grace*, 461 U.S. at 766) (internal citations and quotation marks

omitted).  The court must determine "whether the award itself, as contrasted with the reasoning that

underlies the award, 'create[s][an] explicit conflict with other laws and legal precedents' and thus

clearly violates an identifiable public policy."[5] *Int'l Bhd. of Elec. Workers, Local 97 v. Niagara*

_____

[5] "[I]n principle . . . courts' authority to invoke the public policy exception is not limited
solely to instances where the arbitration award itself violates positive law."  *E. Associated Coal*
*Corp.*, 531 U.S. at 63.  However, the Supreme Court describes the public policy exception as

*Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998) (*Niagara Mohawk I*) (quoting *Misco*, 484 U.S. at 43). The Second Circuit has further instructed that the court's role is to determine "whether the remedy imposed [by the arbitration award] can be fairly and unequivocally shown to violate a well-established public policy." *Id.* at 717. Focusing on the award and remedy imposed is the proper "result-oriented approach" the court should take with respect to testing arbitration decisions with public policy. *See id*. at 717.

The relevant question is thus whether the reinstatement of Bennett—an employee who had been indicted for attempted murder in the second degree and other felonies and had a history of irresponsible, careless, and aggressive behavior at work—would have violated an explicit, well-defined, and dominant public policy. Though Bennett has since been acquitted of the felony charges against him, the court reviews the propriety of the award under the circumstances presented to the arbitration panel. ICC argues that the public policies violated by the arbitration award are embodied in (1) the General Duty Clause of the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 654(a)(1), and (2) 18 U.S.C. §§ 842(d)(3) and 842(i)(1), which regulate explosive materials and explosives, respectively.[6]

---

"narrow," *id*., and the Second Circuit has stressed that courts draw "upon federal regulations where they exist as the principal source for the public policy to be applied." *Niagara Mohawk I*, 143 F.3d at 722.

[6] ICC describes these provisions are part of the Homeland Security Act of 2002, but, in reality, the Homeland Security Act only amended 18 U.S.C. § 842. Neither specific provision ICC cites was affected by the amendments. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1123, 116 Stat. 2135 (2002).

**OSHA General Duty Clause**

The OSHA provision ICC cites provides that "[e]ach employer . . . shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). ICC admits that "OSHA does not specifically prescribe the exact disciplinary action an employer should take in response to a violent or dangerous employee." (ICC Reply Mem. at 6.)

In line with other cases, the court finds the policy articulated in OSHA's General Duty Clause insufficiently explicit, well-defined, and dominant. *See, e.g.*, *Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 127 (2d Cir. 1999) (*Niagara Mohawk II*) (requirement in the Nuclear Regulatory Commission regulations that nuclear power plant employees be "reliable" and "trustworthy," 10 C.F.R. § 73.46, was "by itself . . . too general a standard to justify the reversal of an arbitrator's reinstatement award based on public policy grounds"); *New York State Elec. & Gas Corp. v. Sys. Council U-7 of the Int'l Bhd. of Elec. Workers*, 328 F. Supp. 2d 313, 317 (N.D.N.Y. 2004) (finding citation to OSHA to argue public policy against allowing violent persons to return to workplace insufficient and noting that "OSHA has not promulgated any express rules or regulations that require an employer to terminate an employee who has simply made verbal threats"). As in *Niagara Mohawk II*, where the court rejected generalized standards in Nuclear Regulatory Commission regulations, relying on the broadly worded OSHA provision that ICC cites and vacating the arbitration decision on such grounds would be tantamount to determining public policy from "'general considerations of supposed public interests,' in contravention of the Court's holding in *W.R. Grace*." 196 F.3d at 127; *see also E. Associated Coal Corp.* 531 U.S. at 62.

**Explosive Materials & Explosives**

No other court has analyzed whether any subsection in 18 U.S.C. § 842 delineates "explicit, well-defined, and dominant" public policy sufficient to vacate an arbitration decision, whether in an employee reinstatement situation such as the present case or otherwise.

### *18 U.S.C. § 842(d)(3)*

This provision provides: "It shall be unlawful for any person knowingly to distribute explosive materials to any individual who . . . is under indictment for a crime punishable by imprisonment for a term exceeding one year." "Person," as defined by the statute, can include a "corporation, company, association, firm, partnership, society, or joint stock company." *Id*. § 841(a). "Explosive materials" refers to "explosives, blasting agents, and detonators." *Id*. § 841(b). "Explosives" refers to "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters." *Id*. § 841(d). A list of substances that qualify as explosives is published annually in the Federal Register. *Id*. Both parties agree that at least some of the substances Bennett was handling at the ICC warehouse qualify as "explosives."[7]

---

[7] Though not relevant to the present set of facts, the other two categories of explosive materials are defined as follows: "'Blasting agent' means any material or mixture, consisting of fuel and oxidizer, intended for blasting, not otherwise defined as an explosive: *Provided*, That the finished product, as mixed for use or shipment, cannot be detonated by means of a numbered 8 test blasting cap when unconfined." *Id*. § 841(e). "'Detonator' means any device containing a detonating charge that is used for initiating detonation in an explosive; the term includes, but is not limited to, electric blasting caps of instantaneous and delay types, blasting caps for use with safety fuses and detonating-cord delay connectors." *Id*. § 841(f).

"Distribute" is defined in the statute as "sell, issue, give, transfer, or otherwise dispose of." These individual verbs are not further defined in the statute. ICC's concern is that, by continuing to employ Bennett, it would have been putting explosive materials into his hands in violation of § 842(d)(3). At oral argument, ICC argued that Bennett's handling of chemicals is plainly covered under this definition, but the court reads these verbs as conveying exchange of title rather than mere handling. ICC made no argument regarding "sell" or "issue." As to the other verbs, "give" is defined in *Black's Law Dictionary* as "To voluntarily transfer (property) to another without compensation." BLACK'S LAW DICTIONARY (8th ed. 2004). The definition of "transfer" is "To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of," or "To sell or give." *Id*. "Otherwise dispose of" similarly conveys exchange, or at least abandonment, of title. Nothing in the record indicates that ICC intended to confer ownership of its chemicals to Bennett by employing him to load and unload trucks, move materials between containers, or help with delivery of the materials.

Furthermore, the legislative history for § 842 is devoid of any indication that the statute was intended to govern employment relationships at facilities that handle explosive materials and, where § 842(d) is discussed in particular, focuses instead on the sale of explosive materials to persons listed in § 842(d)(1)–(6). *See* 116 CONG. REC. 35155, 35298 (1970). Some of the other conditions included in § 842(d)—prohibiting distribution of explosive materials to persons "under twenty-one years of age" or who are "unlawful users . . . [of] any controlled substance"—support this interpretation. *See* 18 U.S.C. § 842(d)(1), (5). Adopting ICC's interpretation would mean that employers such as ICC could be prosecuted for employing 20 year-olds or employees merely suspected of drug use if such use were proven by an outside party. As Local 807 pointed out, there

are no such known cases of prosecution. Because § 842(d)(3) is not implicated by Bennett's duties at ICC, it does not present an explicit, well-defined, and dominant policy against reinstating Bennett that would justify vacating the arbitration panel's award.

### 18 U.S.C. § 842(i)(1)

This provision provides: "It shall be unlawful for any person . . . who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport any explosive in or affecting interstate or foreign commerce or to receive or possess any explosive which has been shipped or transported in or affecting interstate or foreign commerce." The verbs "ship," "transport," "receive," and "possess" are not defined in the statute. There is no argument put forth that Bennett's work involved "ship[ping]." In *Black's Law Dictionary*, "transport" is defined as "To carry or convey (a thing) from one place to another," and "possess" is defined as "To have in one's actual control; to have possession of." BLACK'S LAW DICTIONARY (8th ed. 2004). Like "possess," the verb "receive" conveys some type of ownership exchange. Thus, at best, Bennett's duties of moving around chemicals within the ICC compound warehouse or helping with deliveries could only be considered as involving the "transport" of explosives.

However, as with § 842(d), there is no indication in the legislative history for § 842 that § 842(i) was intended to regulate employment relationships at companies such as ICC, and § 842(i) contains the same conditions as § 842(d) regarding persons under twenty-one and "unlawful users" of controlled substances. Thus, the same reasoning as pronounced above in the court's analysis of § 842(d) applies to § 842(i). As with § 842(d)(3), there is no sufficiently explicit, well-defined, and

14

dominant policy in § 842(i)(1) that would justify vacating the arbitration panel's award.

**Conclusion**

In reaching the decision that the arbitration panel's award, reinstating Bennett with back pay, does not violate public policy, the court does not condone Bennett's alleged violent and aggressive behavior. But the court is obligated to enforce the collective bargaining agreement between ICC and its employees. Had ICC abided by notice requirements in Article 47 or terminated Bennett based on a well-founded reason specifically allowed by the CBA, the parties would not have had a dispute to submit to arbitration or this court. It is this larger scheme, which must be supported, that constrains the court.

For the reasons set forth above, ICC's motion to vacate the arbitration award is denied, and Local 807's cross-motion to confirm the arbitration award is granted.

SO ORDERED.

DATED:      Brooklyn, New York
            April 21, 2006

_____/s/_____
              DORA L. IRIZARRY
            United States District Judge